111 F.3d 97
 10 Fla. L. Weekly Fed. C 846
 EAST TENNESSEE MORTGAGE COMPANY, INC., a Georgia
corporation, Assignee of the First National Bank
of Chatsworth, Plaintiff-Appellant,
v.
UNITED STATES FIDELITY AND GUARANTY COMPANY,
Defendant--Third-party Plaintiff, Appellee,
Independent Adjusters, Inc., Third-Party Defendant.
 No. 95-8935.
 United States Court of Appeals,
Eleventh Circuit.
 April 25, 1997.
 
 Thomas R. Todd, Jr., David Joel Gellen, Michael Wolensky, Atlanta, GA, for Plaintiff-Appellant.
 Ben Kingree, III, Michael Andrew Coval, Carter & Ansley, Atlanta, GA, Charles L. Spiller, Tittsworth, Grabbe & Spillers, Atlanta, GA, for Defendant, Third-party Plaintiff.
 Appeal from the United States District Court for the Northern District of Georgia; No. 1:94-CV-0013-RCF, Richard C. Freeman, Judge.
 Before ANDERSON, Circuit Judge, and KRAVITCH and HENDERSON, Senior Circuit Judges.
 ANDERSON, Circuit Judge:
 
 
 1
 CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT TO THE SUPREME COURT OF GEORGIA, PURSUANT TO O.C.G.A. § 15-2-9.
 
 
 2
 TO THE SUPREME COURT OF GEORGIA AND ITS HONORABLE JUSTICES:
 
 
 3
 This action in diversity presents unanswered questions of Georgia law that are determinative of this appeal. We therefore certify these questions to the highest court of the State for resolution. To assist that court, we set out briefly the facts of the case and the parties' arguments.
 
 I. FACTS AND PROCEEDINGS BELOW[1]
 
 4
 Sometime during the 1970s, the United States Army Corps of Engineers leased property on the shores of Carter's Lake in northern Georgia to a corporation known as Blue Ridge Mountain Marina, Inc. ("Blue Ridge"). In 1983, Blue Ridge borrowed $282,500 pursuant to a note and security agreement. The Small Business Administration ("SBA") and First National Bank of Chatsworth ("FNB") jointly participated in this loan: FNB advanced the money, with 90% guaranteed by the SBA, and the security agreement granted the SBA and FNB a security interest in the leasehold and in improvements to the leased premises. Under the terms of the security agreement, the borrower was required to obtain hazard insurance on the collateral.
 
 
 5
 United States Fidelity and Guaranty Company ("USF & G"), the defendant in the present action, issued a fire and extended coverage insurance policy effective April 16, 1987, covering the improvements to the leased premises. Blue Ridge was one of several named insureds in the policy. However, the policy provided, "Subject to the provisions of the mortgage clause attached hereto, loss, if any, on building items, shall be payable to: First National Bank of Chatsworth...." (Throughout this opinion, we will refer to this clause as the "loss-payable clause.")
 
 
 6
 On January 9, 1988, an ice storm damaged various improvements covered by the insurance policy issued by USF & G. The insured submitted notice of loss to USF & G, and in May of 1988 USF & G paid $192,500 to Eagle's Mountain Resort, Inc., the entity the named insureds agreed was to be paid for the loss. USF & G does not dispute that this payment was not in accord with the loss-payable clause, which mandated that the funds be paid to FNB to the extent of the indebtedness remaining on the loan as of the date of the loss.
 
 
 7
 In August of 1990, the loan FNB and the SBA had extended to Blue Ridge went into default.[2] Thereafter (but sometime before July 1991), FNB learned for the first time about the loss and the improper payment. FNB took possession of the insured property and called upon the guarantor of the loan, Mr. Charles Fife ("Fife"),[3] to discharge the debt. In June of 1991, in exchange for a sum negotiated by Fife and the bank, FNB assigned its interests in the property[4] to East Tennessee Mortgage Company ("ETM"), an entity in which Fife is the majority shareholder and which Fife described in his deposition as having been "activated for the acquisition of the position of the First National Bank of Chatsworth regarding Blue Ridge Mountain Marina."[5]
 
 
 8
 On September 16, 1992, over four years after the loss and more than a year after all relevant parties (i.e., both FNB and ETM) had actual knowledge of both the loss and the improper payment,[6] ETM filed suit against USF & G to recover the insurance proceeds improperly paid to the insured. After voluntarily dismissing this first suit, ETM again brought suit against USF & G in state court in December 1993; this second suit was removed to federal court and forms the basis for the instant appeal. In the district court, USF & G moved for summary judgment, arguing that the suit was barred by the "no-suit clause" in the insurance contract. In full, this clause provides:
 
 
 9
 No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within twelve months next after inception of the loss.
 
 
 10
 The district court ultimately agreed with the defendant and granted summary judgment in favor of USF & G.
 
 II. THE PARTIES' ARGUMENTS
 
 11
 On appeal, ETM argues that the no-suit clause is not applicable to the mortgageeB and, consequently, is not applicable to ETM (as the assignee of FNB). ETM draws our attention first to the mortgage clause of the policy, which provides in part:
 
 
 12
 [T]his insurance, as to the interest of the mortgagee (or trustee) only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property, nor by any foreclosure or other proceedings or notice of sale relating to the property, nor by any change in the title or ownership of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by this policy....
 
 
 13
 The effect of such a clause is to "create a separate and distinct contract on the mortgagee's interest and give to it an independent status." Decatur Fed. Savings & Loan Ass'n v. York Ins. Co., 147 Ga.App. 797, 798, 250 S.E.2d 524, 526 (1978). To elucidate the terms of that "separate and distinct contract," ETM relies on the following policy provision (hereafter called the "proof-of-loss clause"):
 
 
 14
 If loss hereunder is made payable, in whole or in part, to a designated mortgagee not named herein as the insured, such interest in this policy may be cancelled by giving to such mortgagee a ten days' written notice of cancellation. If the insured fails to render proof of loss such mortgagee, upon notice, shall render proof of loss in the form herein specified within sixty (60) days thereafter and shall be subject to the provisions hereof relating to appraisal and time of payment and of bringing suit.
 
 
 15
 ETM argues that a negative inference should be drawn from this clause--i.e., that the provisions relating to the time of suit apply to a mortgagee only when the mortgagee receives notice following the failure of the insured to submit a proof of loss. In the instant case, the mortgagee never received notice of the insured's failure to provide a proof of loss (because the insured did in fact provide the proof of loss); therefore, ETM argues, its assignor never became subject to the no-suit clause.
 
 
 16
 USF & G argues in response that ETM's reading of the contract is an impermissible one. In its view, the proof-of-loss clause only describes what happens in the particular situation where an insured does not provide a proof of loss. Because in this case the insured did provide a proof of loss, USF & G argues that the provision has no significance in the determination of this case.
 
 
 17
 ETM argues, in the alternative, that the improper payment to the insured should be construed as a waiver of the no-suit clause. ETM argues that allowing USF & G to avoid the consequences of its breach of the loss-payable clause by enforcing the no-suit clause would be inequitable because the mortgagee never received notice of the loss and the wrongful payment within the year following the loss. Without notice or knowledge, the mortgagee (and its assignee ETM) could not be expected to bring suit within the one-year period. Moreover, the mortgagee's lack of knowledge was directly attributable to the insurer's breach: had USF & G complied with the loss-payable clause, the mortgagee would have been informed.[7]
 
 
 18
 USF & G responds first that an improper payment cannot constitute a waiver of the policy limitations of the contract. USF & G also argues that on these facts, ETM is not entitled to the benefit of equitable relief because all relevant parties undoubtedly had knowledge of both the loss and the improper payment for more than a year before the suit was filed. In other words, USF & G argues that the one-year period of the no-suit clause began to run at least when both the mortgageeB and its assignee (ETM) had knowledge of the loss and the improper payment to the insured.
 
 
 19
 We find in the parties' briefs, the district court's order, and our own research no clear controlling Georgia law as to the dispositive issues in this case.[8] We therefore certify the following questions to the Supreme Court of Georgia.
 
 III. QUESTIONS TO BE CERTIFIED
 
 20
 (1) Is the no-suit clause of the policy described above applicable to the mortgagee without regard to its knowledge of the loss? In other words, does the no-suit clause operate broadly or is there a negative pregnant in the proof-of-loss clause such that the no-suit clause binds the mortgagee only when the mortgagee receives notice following an insured's failure to provide a proof of loss?
 
 
 21
 (2) If the no-suit clause is applicable to the mortgagee without regard to its knowledge, does the insurer's improper payment to the insured and the lack of notice to the mortgagee constitute a waiver of the no-suit clause or estop the insurer from relying on this clause?
 
 
 22
 (3) If either question (1) or question (2) is resolved in favor of the mortgagee, will the instant suit be time-barred nonetheless because suit was brought more than one year after the mortgagee and its assignee learned of the loss and improper payment?
 
 
 23
 Our statement of the questions to be certified is not meant to limit the scope of inquiry by the Supreme Court of Georgia; similarly, the answer to one of the questions may render unnecessary resolution of one or more of the other questions. The entire record of this case, with copies of the briefs of the parties, is transmitted to the court.
 
 
 24
 QUESTIONS CERTIFIED.
 
 
 
 [1]
 We find the parties in substantial agreement as to the facts material to this litigation. We have occasionally noted the source for our recitations where we believe this information will be helpful to the Supreme Court of Georgia
 
 
 [2]
 At the time of the default, the SBA assigned all of its remaining right, title, and interest in the loan to FNB
 
 
 [3]
 The relationship between Blue Ridge and Fife (sometimes referred to in the briefs as "Fite") is not entirely clear. However, a document in the record was signed by Fife on May 1, 1983, as "president" of Blue Ridge Mountain Marina, Inc. Fife's deposition reflects that he resigned as president of Blue Ridge's parent company in December 1983
 
 
 [4]
 Although USF & G contended in its initial filings below that the assignment was not an effective assignment of FNB's rights under the insurance policy, the district court considered USF & G to have waived that argument in subsequent pleadings; USF & G has not argued this point on appeal
 
 
 [5]
 Fife's deposition and the documents attached thereto show that at the time of the assignment, Fife was the sole owner and president of ETM. Within several months of the assignment, however, Fife sold a minority ownership interest in the corporation to a third party; Fife testified that he does not believe he holds any position with ETM at the current time
 
 
 [6]
 The parties agree that Fife knew of the loss to the marina by April 1988. As for Fife's knowledge of the improper payment, USF & G in its letter brief states that Fife knew of the improper payment "on some date before June 6, 1991"; ETM's letter brief asserts that Fife knew of the improper payment "at or about the time ETM was called upon to pay FNB on the guarantee ... in June 1991." On this record, it is clear that Fife, and thus ETM, had knowledge of both the loss and the improper payment more than a year before suit was filed
 
 
 [7]
 We think this argument raises questions regarding estoppel as well as waiver. See questions certified infra
 
 
 [8]
 Although neither controlling nor cited by the parties, Buffalo Ins. Co. v. Steinberg, 105 Ga.App. 366, 124 S.E.2d 681 (1962), may be relevant to the disposition of this case